UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KELLY C.,[1]

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

21-CV-00074-LJV
DECISION & ORDER

---

      On January 15, 2021, the plaintiff, Kelly C. ("Kelly"), brought this action under the Social Security Act ("the Act"). Docket Item 1. She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that she was not disabled.[2] *Id.* On December 13, 2021, Kelly moved for judgment on the pleadings, Docket Item 10; on May 12, 2022, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 12; and on June 21, 2022, Kelly replied, Docket Item 13.

---

[1] To protect the privacy interests of Social Security litigants while maintaining public access to judicial records, this Court will identify any non-government party in cases filed under 42 U.S.C. § 405(g) only by first name and last initial. Standing Order, Identification of Non-Government Parties in Social Security Opinions (W.D.N.Y. Nov. 18, 2020).

[2] Kelly applied for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). One category of persons eligible for DIB includes any adult with a disability who, based on her quarters of qualifying work, meets the Act's insured-status requirements. *See* 42 U.S.C. § 423(c); *Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). SSI, on the other hand, is paid to a person with a disability who also demonstrates financial need. 42 U.S.C. § 1382(a). A qualified individual may receive both DIB and SSI, and the Social Security Administration uses the same five-step evaluation process to determine eligibility for both programs. *See* 20 C.F.R. §§ 404.1520(a)(4) (concerning DIB), 416.920(a)(4) (concerning SSI).

For the reasons that follow, this Court denies Kelly's motion and grants the Commissioner's cross-motion.[3]

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id*. This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alterations omitted) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

---

[3] This Court assumes familiarity with the underlying facts, the procedural history, and the decision of the Administrative Law Judge ("ALJ") and refers only to the facts necessary to explain its decision.

2

**DISCUSSION**

I.    **ALLEGATIONS**

Kelly argues that the ALJ erred in three ways.  Docket Item 10-1.  First, she argues that the ALJ erred by improperly rejecting the opinion of a treating physician, Richard Wolin, M.D.  *Id.* at 16-30.  Second, she argues that the ALJ failed to consider the combined impact of her physical and mental impairments on her ability to work.  *Id.* at 31-33.  Third, she argues that the ALJ erred by not including in her residual functional capacity ("RFC")[4] every limitation in the opinion of the testifying psychologist, Thomas H. England, Ph.D.  *Id.* at 33-37.  This Court disagrees and therefore affirms the Commissioner's finding of no disability.

II.    **ANALYSIS**

    A.  **Dr. Wolin's Opinions**

For claims filed before March 27, 2017, such as Kelly's, an ALJ must evaluate every medical opinion received when determining a claimant's RFC.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  But an ALJ generally should give greater weight to the medical opinions of treating sources—physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists who have "ongoing treatment relationships" with the claimant—because those medical professionals are in the best

---

[4] A claimant's residual functional capacity ("RFC") "is the most [she] can still do despite [her] limitations . . . in an ordinary work setting on a regular and continuing basis."  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2 (Jul. 2, 1996)).  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  *Id*

3

positions to provide "detailed, longitudinal picture[s] of [the claimant's] medical impairments." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) ("The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."). In fact, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).

Before an ALJ may give less-than-controlling weight to a treating source's opinion, the ALJ must "*explicitly* apply the factors listed in [sections 404.1527 and 416.927]; the failure to do so is procedural error." Schillo v. Kijakazi, 31 F.4th 64, 75 (2d Cir. 2022) (emphasis in original). These factors, sometimes referred to as "Burgess factors," include: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Id. (quoting Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019)); see Burgess, 537 F.3d at 129.

Here, Dr. Wolin completed two medical source statements, one in March 2014 and one in May 2016. See Docket Item 6 at 462-67, 750-755. In the March 2014 statement, Dr. Wolin opined that Kelly was seriously limited in her ability to: (1) maintain attention for two-hour segments; (2) make simple work-related decisions; (3) deal with

4

normal work stress; (4) carry out detailed instructions; (5) set realistic goals or make plans independently of others; (6) deal with the stress of semiskilled and skilled work; (7) travel in unfamiliar places; and (8) use public transportation.  Docket Item 6 at 464-65.  He opined that Kelly was unable to meet competitive standards in her ability to: (1) maintain regular attendance and be punctual within customary, usually strict tolerances; (2) work in coordination with or proximity to others without being unduly distracted; and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms.  *Id.*  Based on Kelly's impairments, Dr. Wolin estimated that Kelly would miss more than four days of work per month.  *Id.* at 466.

In the May 2016 statement, Dr. Wolin opined that Kelly was seriously limited in every mental ability and aptitude needed to do unskilled work, semiskilled work, or skilled work.  *See id.* at 752-53.[5]  But he also opined that Kelly was limited but satisfactory in every mental ability and aptitude needed to do particular types of work and in her ability to: (1) sustain an ordinary routine without special supervision; (2) work in coordination with or proximity to others without being unduly distracted; (3) make simple work-related decisions; (4) respond appropriately to changes in a routine work setting; and (5) be aware of normal hazards and take appropriate precautions.  *Id.*  Unlike the March 2014 statement, the May 2016 statement did not indicate that Kelly was unable to meet competitive standards in any area.  *Compare* Docket Item 6 at 464 (March 2014 statement finding Kelly unable to meet competitive standards in three

---

[5] Dr. Wolin also assessed Kelly's general functional limitations in the May 2016 statement.  More specifically, he opined that Kelly had a moderate limitation in performing activities of daily living and marked limitations in maintaining social functioning and in maintaining concentration, persistence, or pace.  Docket Item 6 at 754.

mental abilities and aptitudes needed to do unskilled work); *with id.* at 752 (May 2016 statement). But Dr. Wolin again opined that Kelly would miss more than four days of work per month due to her mental impairments. *Id.* at 755.

The ALJ assigned both of Dr. Wolin's opinions "little weight" because they were not "well supported by medically acceptable clinical and laboratory diagnostic techniques" and were "inconsistent with other substantial evidence in the record." *Id.* at 781 (citing SSR 96-2p, 1996 WL 347188, at *1 (July 2, 1996)). For example, the ALJ found the opinions inconsistent with Kelly's self-reported activities of daily living as well as the psychiatric consultative examinations and their "benign mental status findings." *Id.* He also found the opinions unsupported by Kelly's treatment records from Horizons Health Services, which indicated "routine, limited[,] and conservative treatment modalities and . . . relatively benign mental status findings upon examinations." *Id.* at 777, 781.

The ALJ provided specific record cites to support his findings. For instance, the ALJ noted:

> [D]espite reporting feelings of depression and anxiety, as well as a history of mood instability, along with life stressors, and occasionally exhibiting mumbling speech, [Kelly] is alert, oriented in all spheres with intact and normal cognitive functioning, is cooperative in behavior with good eye contact and no psychomotor agitation noted upon examinations, and has normal speech with logical and linear thought processes which are goal-directed with rational thought content, without loose associations, hallucinations[,] or suicidal ideations and normal ability to concentrate, is attentive, has intact memory[,] and fair insight and judgment (Exhibit C1F, p. 32; Exhibit C5F, p. 2; Exhibit C7F, p. 14, 20, 27, 38; Exhibit C12F, p. 4-5; Exhibit C22F, p. 32; Exhibit 23F, p. 3-4, 12).

Docket Item 6 at 777-78. The ALJ also noted that "[m]ore recently, [Kelly] reported that she felt like she was 'turning a corner,' that her medications were adequate[,] and she

6

denied having any side effects, with her mental status examination reflecting euthymic mood and affect, normal speech, she was oriented X3, her thought content was appropriate, she showed logical thought process, normal cognitive status[,] and good insight and judgment (Exhibit C23, p. 4-6)." *Id.* at 778.

Kelly argues that the ALJ did not follow the treating physician rule in assessing Dr. Wolin's opinions. *See* Docket Item 10-1 at 16-17. But the ALJ acknowledged Dr. Wolin's status as Kelly's treating physician, and he explicitly applied the *Burgess* factors in deciding that Dr. Wolin's opinions were entitled to only little—not controlling—weight. *See* Docket Item 6 at 781. Indeed, the ALJ recited those factors and explained that even though, as Kelly's treating physician, Dr. Wolin "gained at least some general knowledge of her conditions," the limitations about which Dr. Wolin opined "are not consistent with [Kelly's] self-reported activities of daily living" or "supported by" the medical records and the psychiatric consults. *Id*. And, as noted above, the ALJ analyzed the record in some detail in reaching those conclusions. *See id*. at 777-78, 781. So the ALJ indeed met the requirements of the treating physician rule.

Kelly also argues that the ALJ "did not conduct a proper treating source analysis." Docket Item 10-1 at 17. She says, for example, that "[t]he first factor, 'the frequency, length, nature, and extent of treatment' favor[ed] granting one or both of Dr. Wolin's opinions controlling weight." *Id.* (quoting *Scheuer v. Berryhill*, 269 F. Supp. 3d 66, 85 (W.D.N.Y. 2017)). But that argument is nothing more than a disagreement with the ALJ's weighing of the evidence, and it is "not the function of this Court to re-weigh evidence or consider *de novo* whether [Kelly] is disabled." *Teena H. o/b/o N.I.K.*, 521 F. Supp. 3d 287, 292 (W.D.N.Y. 2021); *see also Pellam v. Astrue*, 508 F. App'x 87, 91 (2d

Cir. 2013) ("We think that Pellam is, in reality, attempting to characterize her claim that the ALJ's determination was not supported by substantial evidence as a legal argument in order to garner a more favorable standard of review.").

Kelly says that the ALJ also erred by "not provid[ing] good reasons" for discounting Dr. Wolin's opinion and by "violat[ing] the Law of the Case Doctrine [sic]." Docket Item 10-1 at 21.  Kelly's case was previously remanded because another judge of this Court was "unable to conclude that good reasons support[ed] the ALJ's decision to discount the opinions from [Dr.] Wolin," see Docket Item 6 at 903-18 (Payson, M.J.), and Kelly seems to argue that the ALJ did no better the second time around.

"A corollary to the treating physician rule is the so-called good[-]reasons rule, which is based on the regulations specifying that the Commissioner will always give good reasons for the weight given to a treating source opinion." *Harris v. Colvin*, 149 F. Supp. 3d 435, 441 (W.D.N.Y. 2016) (internal quotation marks and citation omitted); see *Schillo*, 31 F.4th at 75 ("At both steps, the regulations require the ALJ to give 'good reasons'—i.e., reasons supported by substantial evidence in the record, for the weight she affords the treating source's medical opinion.").  The law of the case doctrine, on the other hand, "although not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons, including, *inter alia*, the need to correct a clear error or prevent manifest injustice." *In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (internal quotation marks and citation omitted). Neither the good-reasons rule nor the law of the case doctrine requires a different result here.

Contrary to Kelly's argument, the law of the case doctrine does not "mandate[] that this Court reject ALJ Georger's rationale for rejecting Dr. Wolin's opinions in this case." Docket Item 10-1 at 27. When this Court previously issued a remand order under sentence four of 42 U.S.C. § 405(g), which constituted a "final judgment" in a civil action, it did not retain jurisdiction over Kelly's case. *See Shalala v. Schaefer*, 509 U.S. 292, 299 n.3 (1993); SSA Office of Hearings and Appeals, *HALLEX: Hearings, Appeals and Litigation Law Manual*, I-4-6-1B(1) (2020). Kelly's current action is a new case entirely. *See generally* Docket Item 1.

And even if that were not the case, nothing in the prior decision issued by Judge Payson affects this Court's review of a new decision by a different ALJ. Stated another way, the fact that Judge Payson found that the first ALJ failed to "properly appl[y]" the treating physician rule does not require this Court to reach the same conclusion about the second ALJ's analysis.

Kelly also claims that the ALJ did not provide "good reasons" for rejecting Dr. Wolin's opinions because the reasons given were similar to those reasons rejected by Judge Payson. But as noted above, and similar or not, the ALJ gave good reasons for discounting Dr. Wolin's opinions.

Indeed, the ALJ acknowledged Judge Payson's prior remand order and noted that he could not discount Dr. Wolin's opinions simply because Dr. Wolin found that Kelly did not have a "serious persistent mental illness." *See id.* at 719, 781; *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00G(2)(a) (discussing the process by which ALJs evaluate whether a severe mental impairment is a "serious and persistent" mental disorder). The ALJ then explicitly listed the *Burgess* factors, applied them, and

explained the reason for his assignment of little weight to Dr. Wolin's opinions.  For example, unlike the first ALJ who did not "discuss the first Burgess factor—the 'frequency, length, nature, and extent of treatment,'" see Docket Item 6 at 913, the ALJ here explicitly addressed that factor, id. at 781.  So unlike the ALJ's decision the first time around, the ALJ here noted both the treating physician rule and this Court's prior remand, and he carefully analyzed the record to avoid the errors made by his predecessor.

In sum, the ALJ properly evaluated Dr. Wolin's opinions under the treating physician rule.  He first decided that Dr. Wolin's opinions were not entitled to controlling weight, and he then decided that they were entitled only to little weight.  See Docket Item 6 at 781.  And he based his conclusion on his explicit consideration of the Burgess factors.  See id.  For all those reasons, the ALJ did not err in assigning weight to Dr. Wolin's opinions.

### B.  The Combined Impact of Kelly's Physical and Mental Impairments

Kelly also argues that the ALJ failed to consider the combined impact of her physical and mental impairments on her ability to work.  Docket Item 10-1 at 31.  According to Kelly, by giving great weight to the opinion of Thomas England, Ph.D., and little wight to the opinions of Dr. Wolin, the ALJ addressed Kelly's mental impairments without considering how those impairments were exacerbated by her physical impairments.  Id.  That is especially so, Kelly says, because Dr. England limited his testimony to Kelly's mental impairments, see, e.g., id. at 52-53, and acknowledged that a treating physician might be able to better assess functional limitations that result from a combination of physical and mental impairments, see id. at 55.

An ALJ is obligated to consider the combined effect of a claimant's physical and mental impairments.  *See* 20 C.F.R. §§ 404.1523(c), 416.923(c) ("If we do find a medically severe combination of impairments, we will consider the combined impact of the impairments throughout the disability determination process.").  As the Second Circuit has noted, an ALJ "must evaluate [the physical and mental impairments'] combined impact on a claimant's ability to work, regardless of whether every impairment is severe."  *McIntyre v. Colvin*, 758 F.3d 146, 151-52 (2d Cir. 2014) (internal quotation marks and citation omitted).  But the ALJ did that here.

For example, at step two of the disability determination, the ALJ found that Kelly suffered from severe physical and mental impairments: degenerative disc disease and spondylosis of the lumbar spine, osteoarthritis of the right hip and both knees, meralgia paresthetica[6] of both legs, obesity, bipolar disorder, post-traumatic stress disorder ("PTSD"), and obsessive-compulsive disorder ("OCD").  Docket Item 6 at 766.  And he concluded that Kelly's severe impairments, either singularly or in combination, did not meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 767.

Likewise, the ALJ addressed Kelly's physical and mental impairments at subsequent steps of the analysis.  For example, he included limitations in Kelly's RFC accommodating both her physical and her mental impairments.[7]  *See id.* at 771.

---

[6] Meralgia paresthetica is defined as "burning pain, tingling, pruritus, or formication along the lateral aspect of the thigh in the distribution of the lateral femoral cutaneous nerve due to entrapment of that nerve."  *Meralgia Paresthetica*, Stedmans Medical Dictionary § 542360, Westlaw (database updated Nov. 2014).

[7] The ALJ found that Kelly had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with the following limitations:

11

Likewise, during the administrative hearing, the ALJ posed hypotheticals to the vocational expert that accounted for both physical and mental impairments.  *See id.* at 822-26; *see also McIntyre*, 758 F.3d at 153 ("By explicitly limiting the hypothetical to such tasks (after fully explaining McIntyre's physical restrictions), the ALJ sufficiently accounted for the combined effect of McIntyre's impairments." (internal quotation marks, alteration, and citation omitted)).  And his analysis at step three addressed both physical and mental issues in considerable detail.  *See* Docket Item 6 at 771-83.

Contrary to Kelly's argument, the fact that Dr. England conceded that a physician might be better able than a psychologist to address the combined effects of physical and mental impairments does not mean that the ALJ was required to give more weight to the opinion of Dr. Wolin, a physician, than to the opinion of Dr. England, a psychologist.  The ALJ weighed the opinion evidence as he was required to do, and, as noted above, he gave appropriate deference to the opinion of Dr. Wolin as a treating physician.  The ALJ found, however, that the record evidence better supported Dr.

---

> [Kelly] can frequently reach overhead and to the left and to the right, and frequently handle, finger[,] and feel with the left and right hand; [Kelly] can climb ramps and stairs occasionally, never kneel, never crouch, and never crawl; [Kelly] can occasionally work at unprotected heights, with moving mechanical parts, and operate a motor vehicle; [Kelly] can frequently work in humidity and wetness, in dust, odors, fumes[,] and pulmonary irritants, in extreme cold and heat[,] and in moderate noise; [Kelly] is able to perform simple, routine[,] and repetitive tasks but not at a production rate pace (e.g. assembly line work), and make simple work-related decisions; [Kelly] can have occasional interaction with supervisors, coworkers, and the public; [Kelly] must be afforded a sit/stand option, changing positions every 10 minutes; and [Kelly] can have only occasional exposure to workplace visual hazards (boxes left on the floor, doors left ajar).

Docket Item 6 at 771.

England's opinion than Dr. Wolin's, and the ALJ provided good reason for that conclusion.  So the ALJ did not err in affording weight to any of the opinions.

Kelly's suggestion that the ALJ did not consider the combined effects of her physical and mental impairments is grounded in little more than speculation.  In fact, Kelly's second argument here, like her first argument, boils down to a disagreement with the ALJ's analysis and weighing of the evidence.  Because the ALJ weighed all the opinion evidence as well as the medical evidence in the record, he did not err by failing to consider the combined effects of all Kelly's impairments on her ability to work.

### C. Dr. England's Opinion

Kelly finally argues that the ALJ's failure to incorporate all Dr. England's limitations in the RFC was error.  *See* Docket Item 8-1 at 33.  In 2016, Dr. England testified that Kelly would need to work in a position with "relatively low stress, . . . relatively superficial contact with coworkers[,] and one that didn't involve high rates of quota activity."  Docket Item 6 at 53.  Kelly says that the ALJ's limitation to only "occasional interaction" with co-workers is less restrictive than "superficial contact" and that because the ALJ gave "great weight" to Dr. England's opinion, that was error. Docket Item 8-1 at 33-35.

An ALJ must "weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."  *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013); *accord Schillo*, 31 F.4th at 78.  But that does not mean that the RFC needs to "perfectly correspond with any of the opinions of medical sources cited in [the ALJ's] decision."  *Matta*, 508 F. App'x at 56.  As long as the ALJ considers all the medical evidence and appropriately analyzes the medical opinions, an RFC consistent with the

13

record is not error.  See 20 C.F.R. §§ 404.1545, 416.945; see also Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (holding that remand is not necessary "[w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence").

The ALJ's limiting of Kelly to "simple, routine[,] and repetitive tasks but not at a production rate pace (e.g.[,] assembly line work)" and to only "occasional" interaction with co-workers and supervisors appropriately accounts for Dr. England's opinion.  First, contrary to Kelly's argument, see Docket Item 10 at 35, Dr. England's opinion did not limit Kelly to brief and superficial interaction with others; rather, he said that she could do work that involved "relatively superficial contact with coworkers" and that "in a brief superficial relationship, [she] appears to be able to interact and relate adequately."  Docket Item 6 at 52-53.  Moreover, by limiting Kelly to work that did not have a quota, that was simple and routine, and that involved only occasional interaction with others, the ALJ factored into the RFC equation any concerns that Dr. England had about Kelly's interpersonal limitations.

Indeed, as a Social Security term of art, "occasionally" means "occurring from very little up to one-third of the time."  SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).  For Kelly to have been any more restricted in this area, the ALJ would have had to have found that she could never interact with co-workers or supervisors.  See SSA Office of Hearings and Appeals, POMS: Program Operations Manual System, DI 25001.001A.34 (2023) (noting that environmental conditions are either not present, or they are present occasionally, frequently, or constantly).  And it certainly was not Dr.

England's opinion that Kelly could never interact with others.  *See* Docket Item 6 at 52-55.

In sum, the RFC adequately accounted for Dr. England's limitations, and Kelly's third argument fails as well.

## **CONCLUSION**

The ALJ's decision was not contrary to the substantial evidence in the record, nor did it result from any legal error.  Therefore, and for the reasons stated above, Kelly's motion for judgment on the pleadings, Docket Item 10, is DENIED, and the Commissioner's cross-motion for judgment on the pleadings, Docket Item 12, is GRANTED.  The complaint is DISMISSED, and the Clerk of Court shall close the file.

SO ORDERED.

Dated: May 10, 2023
Buffalo, New York

 */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE